**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

MATTHEW IANELLI, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

YORK SPACE SYSTEMS INC.,
DIRK WALLINGER,
KEVIN MESSERLE,
KIRK KONERT,
TYLER LETARTE,
TAMRA ERWIN,
REGGIE BROTHERS,
ANDREW BOYD,
JAMES MCCONVILLE,
GOLDMAN SACHS & CO. LLC,
JEFFERIES LLC,
WELLS FARGO SECURITIES, LLC,
J.P. MORGAN SECURITIES LLC,
CITIGROUP GLOBAL MARKETS INC.,
TRUIST SECURITIES, INC.,
ROBERT W. BAIRD & CO. INCORPORATED,
RAYMOND JAMES & ASSOCIATES, INC.,
CANACCORD GENUITY LLC,
NEEDHAM & COMPANY, LLC, and
ACADEMY SECURITIES, INC.

Defendants,

---

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

Plaintiff Matthew Ianelli ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by York Space Systems Inc. ("York" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by York; and (c) review of other publicly available information concerning York.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired York common stock pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's January 2026 initial public offering ("IPO" or the "Offering"); and/or (b) securities between January 29, 2026 and May 11, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2. York operates as a space and defense provider that primarily sells satellites and satellite related services. For fiscal 2025, 96% of York's revenue was derived from projects contracted by the U.S. Federal Government under the Pentagon's Space Development Agency ("SDA"). The majority of these projects were contracted to York under the SDA's Transport Layer program, which is an experimental military satellite constellation designed to provide global tactical data.

3. On January 30, 2026, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold approximately 18.5 million shares of common stock at a price of $34.00 per share. The Company received proceeds of approximately $583.4 million from the Offering, net of underwriting discounts and commissions. The proceeds from the IPO were purportedly to be used for general corporate and working capital purposes.

4. In April 2026, the U.S. Space Force released its Spring 2026 budget, revealing a restructuring of the SDA's Transport Layer program and an immediate halt to the third tranche of Transport Layer payments. The third tranche of the Transport Layer program payments, which had previously been expected to substantially benefit York, would instead fund the newly unveiled Space Data Network.

5. On May 11, 2026, at approximately 10 AM EST, Wolfpack Research published a report, stating that it "suspect[s]" that the Pentagon's decision to "halt Tranche 3 funding and destroy the SDA . . . may have been due to York's failure to live up to their own hype." Among other things, the report stated that the Company's "main pitch to customers and investors" was "that they [are] operating on a modular platform" but multiple former employees claimed that York "sent satellites into space without even knowing if the software was fit to accomplish its basic mission." That is, the report claimed that "York's satellites simply did not function as expected because the company did not finish developing the software for these satellites before launching them" and waited until they were in orbit to fully debug them.

6. On this news, YSS stock price fell approximately $7 during intraday trading on May 11, 2026, on unusually heavy trading volume.

7. By the commencement of this action, the Company's stock was trading as low as $9.33 per share, an over 70% decline from the $34 per share IPO price.

8. In the Registration Statement and throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that York's onboard mission and payload software was not fully functional before satellites were launched; (2) that this ongoing trend presented a risk to the Company's contracts with the SDA; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

13. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

14. Plaintiff Matthew Ianelli, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired York common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO and/or York securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15. Defendant York is incorporated under the laws of the Delaware with its principal executive offices located in Greenwood Village, Colorado. York's shares trade on the New York Stock Exchange ("NYSE") exchange under the symbol "YSS."

16. Defendant Dirk Wallinger ("Wallinger") was, at all relevant times, the Chief Executive Officer ("CEO") of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

17. Defendant Kevin Messerle ("Messerle") was, at all relevant times, the Chief Financial Officer ("CFO") of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

18. Defendants Wallinger and Messerle (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

19. Defendant Kirk Konert ("Konert") consented to be named as an incoming director in the Company's Registration Statement filed with the SEC.

20. Defendant Tyler Letarte ("Letarte") consented to be named as an incoming director in the Company's Registration Statement filed with the SEC.

21. Defendant Tamra Erwin ("Erwin") consented to be named as an incoming director in the Company's Registration Statement filed with the SEC.

22. Defendant Reggie Brothers ("Brothers") consented to be named as an incoming director in the Company's Registration Statement filed with the SEC.

23. Defendant Andrew Boyd ("Boyd") consented to be named as an incoming director in the Company's Registration Statement filed with the SEC.

24. Defendant (Ret.) Gen. James McConville ("McConville") consented to be named as an incoming director in the Company's Registration Statement filed with the SEC.

25. Defendants Wallinger, Messerle, Konert, Letarte, Erwin, Brothers, Boyd, and McConville are collectively referred to hereinafter as the "Securities Act Individual Defendants."

26. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter for the Company's IPO. In the IPO, Goldman Sachs agreed to purchase 5,123,695 shares of the Company's common stock, exclusive of the over-allotment option.

27. Defendant Jefferies LLC ("Jefferies") served as an underwriter for the Company's IPO. In the IPO, Jefferies agreed to purchase 4,118,261 shares of the Company's common stock, exclusive of the over-allotment option.

28. Defendant Wells Fargo Securities, LLC ("Wells Fargo") served as an underwriter for the Company's IPO. In the IPO, Wells Fargo agreed to purchase 4,118,261 shares of the Company's common stock, exclusive of the over-allotment option.

29. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO. In the IPO, J.P. Morgan agreed to purchase 1,809,783 shares of the Company's common stock, exclusive of the over-allotment option.

30. Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the Company's IPO. In the IPO, Citigroup agreed to purchase 1,447,826 shares of the Company's common stock, exclusive of the over-allotment option.

31. Defendant Truist Securities, Inc. ("Truist") served as an underwriter for the Company's IPO. In the IPO, Truist agreed to purchase 506,739 shares of the Company's common stock, exclusive of the over-allotment option.

32. Defendant Robert W. Baird & Co. Incorporated ("Baird ") served as an underwriter for the Company's IPO. In the IPO, Baird agreed to purchase 434,348 shares of the Company's common stock, exclusive of the over-allotment option.

33. Defendant Raymond James & Associates, Inc. ("Raymond James") served as an underwriter for the Company's IPO. In the IPO, Raymond James agreed to purchase 434,348 shares of the Company's common stock, exclusive of the over-allotment option.

34. Defendant Canaccord Genuity LLC ("Canaccord") served as an underwriter for the Company's IPO. In the IPO, Canaccord agreed to purchase 217,174 shares of the Company's common stock, exclusive of the over-allotment option.

35. Defendant Needham & Company, LLC ("Needham") served as an underwriter for the Company's IPO. In the IPO, Needham agreed to purchase 217,174 shares of the Company's common stock, exclusive of the over-allotment option.

36. Defendant Academy Securities, Inc. ("Academy ") served as an underwriter for the Company's IPO. In the IPO, Academy agreed to purchase 72,391 shares of the Company's common stock, exclusive of the over-allotment option.

37. Defendants Goldman Sachs, Jefferies, Wells Fargo, J.P. Morgan, Citigroup, Truist, Baird, Raymond James, Canaccord, Needham, and Academy are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

38. York operates as a space and defense provider which primarily sells satellites and satellite related services. Approximately 96% of its fiscal 2025 revenue was derived from projects contracted by the U.S. Federal Government under the SDA. The majority of these projects were contracted to York under the SDA's Transport Layer program, which is an experimental military satellite constellation designed to provide global tactical data.

### The Company's False and/or Misleading Registration Statement and Prospectus

39. On November 17, 2025, the Company filed its Registration Statement on Form S-1 with the SEC, which forms part of the Registration Statement.

40. On January 26, 2026, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1/A, which forms part of the Registration Statement. The Registration Statement was declared effective on January 28, 2026.

41. On January 30, 2026, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold approximately 18.5 million shares of common stock at a price of $34.00 per share. The Company received proceeds of approximately $583.4 million from the Offering, net of underwriting discounts and commissions. The proceeds from the IPO were purportedly to be used for general corporate and working capital purposes.

42. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements

made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

43. Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

44. The Registration Statement further touted the Company's purportedly "***successful launches with the SDA***" which "translate to strong references, faster award cycles, and growing share across defense, civil, and commercial segments." Specifically, the Registration Statement stated as follows, in relevant part:

> Space Defense Agency: We were a prime awardee on SDA contracts across Tranches 0, 1 and 2 with an incumbent position leading into Tranches 3 and 4. Our longstanding relationships with key government agencies and reputation for on-time, on-budget delivery of spacecraft strengthen our position to win PWSA replenishment and expansion opportunities. We have provided the most satellites to PWSA at roughly half the cost of competitors, positioning us exceptionally well to continue to receive a large share of PWSA awards.

45. The Registration Statement touted the Company's capabilities, including its "differentiated suite of spacecraft solutions with ***proven, common technologies***" such as "***proprietary satellite software*** enabling versatile integration of a variety of payloads for customers and supply chain commonalities across platforms." The Registration Statement further touted "York's ***mission-ready ground software solution.***" Specifically, the Registration Statement stated as follows, in relevant part:

> In addition, ***we provide software throughout the space layer, bolstered by our 2023 acquisition of Emergent Space Technologies ("Emergent"), including flight control and edge computing,*** and we recently added more than 45 ground antennas in connection with our acquisition of ATLAS Space Operations (the "ATLAS Acquisition").

> Our capabilities include a differentiated suite of spacecraft solutions with proven, common technologies. We offer the S-CLASS, LX-CLASS, and M-CLASS spacecraft, which are high-quality, low-cost satellite platforms that are proven and scalable to a wide array of space market needs. ***Our spacecraft are supported by proprietary satellite software enabling versatile integration of a variety of payloads for customers and supply chain commonalities across platforms.*** The various spacecraft classes are designed and engineered to address a broad cross section of the spacecraft market while maximizing payload accommodation. The LX-CLASS is double the mass of the S-CLASS and leverages the S-CLASS design, sharing more than 90% of its technology with the S-CLASS, to offer a specialized platform with enhanced capabilities. Similarly, the M-CLASS utilizes the previous satellite platform designs, sharing approximately 75% of its hardware and 95% of its software with the S-CLASS and LX-CLASS, while greatly enhancing scale and power for spacecraft mass up to 2,000 kg and 8kW+ peak power consumption. Our proven suite of platforms provide solutions from 100 to 2,000 kgs and enables us to serve a large total addressable market.

46. The Registration Statement also touted the Company's purported competitive strengths, including its "modular approach" and "disciplined production management" as follows, in relevant part:

> ***Vertically integrated, cost-effective, rapid manufacturing model delivering value at scale with a comprehensive IP set and proprietary software***
>
> York's vertical integration, spanning spacecraft platforms, avionics, power and data handling, automated test, and integrated flight and ground software, drives a repeatable production system with learning-curve cost reductions. Our ***modular, backward-compatible design*** approach allows us to maximize common components and streamline production, increasing efficiency and scalability. At the same time, our ***advanced digital processes and disciplined production management are designed to reduce cycle times, minimize work, and ensure consistent delivery performance***. Proprietary operations software and federated ground integrations lower operating costs per satellite and scale fleet management efficiently. The result is lower cost per unit, faster design-to-orbit timelines, and durable margin advantages as volumes rise.
>
> We are pioneering scaled, modular space and defense technology solutions that redefine how missions are designed, deployed, and sustained. At the core of our offering is a satellite architecture built for flexibility and scaled production, allowing customers to configure platforms for a wide range of mission sets, from commercial communications and Earth observation to national security and defense

> applications. ***This modular approach is designed to not only accelerate deployment timelines but also drive significant cost efficiencies.***

47. The Registration Statement purported to warn of risks which "***could***" or "***may***" negatively impact the Company, including that a "***material adverse change in the SDA's mandate could materially reduce [] revenues.***" Specifically, the Registration Statement stated as follows, in relevant part:

> ***We derive a substantial amount of our revenues and backlog from our largest customer, the Space Development Agency. A material adverse change in the SDA's mandate could materially reduce our revenues and backlog.***
>
> As of and for the nine months ended September 30, 2025, the SDA accounted for substantially all of our revenue and backlog. A material change in the SDA's mandate or spending could reduce future revenues we receive from the SDA, and could materially reduce our revenues and backlog. ***The SDA could change its ordering patterns or spending strategy, be delayed in the fulfillment of its contractual obligations to us, reduce or cease its use of our services, or become unable to pay for services it had contracted to buy, whether due to a downturn in appropriations, a government shutdown or various other causes, including the risk of changes to future government funding levels, which may be substantially curtailed or abandoned and result in contract cancellations, modifications, delays, or reduction in orders.*** In particular, the current U.S. presidential administration has indicated it is committed to decreasing federal spending and the size of the federal government. If the current administration were to take actions that impacted the amount the SDA is able to spend on our services, it could materially adversely impact our business, results of operations, and financial condition. In addition, under our contracts, the SDA generally has the right to terminate, cancel, or curtail its contracts with us for convenience. Any decision by the SDA to terminate, cancel, or curtail our contracts would adversely affect our backlog revenues, revenue growth, and profitability. If our backlog is reduced as a result of any of the foregoing factors or for other reasons, including terminations for convenience, our revenues, operating margins, and cash flows would be further negatively impacted.

48. The Registration Statement was materially false and misleading and omitted to state: (1) that York's onboard mission and payload software was not fully functional before satellites were launched; (2) that this ongoing trend presented a risk to the Company's contracts

with the SDA; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

**Materially False and Misleading**

**<u>Statements Issued During the Class Period</u>**

49. The Class Period begins on January 29, 2026. On that day, York's common stock began publicly trading pursuant to the Registration Statement.

50. On March 19, 2026, York issuing a press release announcing fourth quarter and full year 2025 results. The press release touted the Company successfully delivered satellites under the Tranche 1 contract. Specifically, the press release stated as follows, in relevant part:

> **Full Year 2025 Company Results**
>
> ***Revenue increased $133 million, or 52%, to $386 million.*** This increase was primarily driven by increased completion against two of our Transport Layer Tranche 2 contracts.
>
> * * *
>
> **Selected highlights**
>
> ***York delivered 21 Tranche 1 Transport Layer satellites to orbit for the Proliferated Warfighter Space Architecture (PWSA) becoming the first prime to execute an on-orbit delivery under the Tranche 1 contract. York made contact with all spacecraft within hours of launch separation.*** York was a month ahead of its nearest competitor in launching these Tranche 1 Transport Layer space vehicles.
>
> York launched and executed more than 100 mission demonstrations for NASA's BARD mission, exceeding baseline performance objectives and validating NASA's transition toward a commercially delivered communications architecture in months.
>
> York acquired ATLAS Space Operations, combining a global ground station network with a software-defined operations platform, to eliminate ground

> communications bottlenecks and integrate mission critical space-to-ground connectivity into York's end-to-end mission architecture.

51. On March 19, 2026, the Company submitted its annual report for the fiscal year ended December 31, 2025 on a Form 10-K filed with the SEC (the "FY25 10-K"). The FY25 10-K affirmed the previously reported financial results. The FY25 10-K further touted the manner in which the Company allegedly performed under its SDA and NASA contracts, as follows in relevant part:

> ***We have demonstrated repeat wins through multi-vehicle awards, options, and frameworks that value mission assurance, cost transparency, and delivery velocity. Our performance history across PWSA Tranches 0, 1, and 2 as well as our successful launches with the SDA and NASA translate to strong references, faster award cycles, and growing share across defense, civil, and commercial segments.*** For example, our space vehicles have participated in multiple military exercises.
>
> •<u>Space Defense Agency</u>: We were a prime awardee on SDA contracts across Tranches 0, 1 and 2 with an incumbent position leading into Tranches 3 and 4. We have provided the most satellites to PWSA at roughly half the price of competitors, positioning us exceptionally well to continue to receive a large share of PWSA awards.

52. The FY25 10-K further purported to warn of risks which "***could***" or "***may***" negatively impact the Company, including those risks related to an adverse change in the SDA's mandate, stating as follows, in relevant part:

> ***We derive a substantial amount of our revenues and backlog from our largest customer, the Space Development Agency. A material adverse change in the SDA's mandate could materially reduce our revenues and backlog.***
>
> As of and for the year ended December 31, 2025, the SDA accounted for substantially all of our revenue and backlog. A material change in the SDA's mandate or spending could reduce future revenues we receive from the SDA, and could materially reduce our revenues and backlog. The SDA could change its ordering patterns or spending strategy, be delayed in the fulfillment of its contractual obligations to us, reduce or cease its use of our services, or become unable to pay for services it had contracted to buy, whether due to a downturn in

> appropriations, a government shutdown or various other causes, including the risk of changes to future government funding levels, which may be substantially curtailed or abandoned and result in contract cancellations, modifications, delays, or reduction in orders. In particular, the current U.S. presidential administration has indicated it is committed to decreasing federal spending and the size of the federal government. If the current administration were to take actions that impacted the amount the SDA is able to spend on our services, it could materially adversely impact our business, results of operations, and financial condition. In addition, under our contracts, the SDA generally has the right to terminate, cancel, or curtail its contracts with us for convenience. Any decision by the SDA to terminate, cancel, or curtail our contracts would adversely affect our backlog revenues, revenue growth, and profitability. If our backlog is reduced as a result of any of the foregoing factors or for other reasons, including terminations for convenience, our revenues, operating margins, and cash flows would be further negatively impacted.

53. The above statements identified in ¶¶49-52 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that York's onboard mission and payload software was not fully functional before satellites were launched; (2) that this ongoing trend presented a risk to the Company's contracts with the SDA deceived the SDA with false advertising to win its contracts, cut corners, and delivered satellites whose mission-critical-software was not completed; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

**<u>The Subsequent Disclosures</u>**

54. On March 26, 2026, *Breaking Defense* reported that the SDA "is at least three months behind schedule for demonstrating that its first set of data relay and missile tracking satellites can 'talk' to each other via laser links – a requirement at the heart of its Proliferated Warfighter Space Architecture (PWSA) mesh network in low Earth orbit (LEO)." The article stated, in relevant part:

> "We have not established the mesh network for Tranche 1 yet," SDA Director GP Sandhoo told the annual Satellite Conference on Tuesday. "We're going through orbit raising … . We are about three months behind."
>
> The goal, Sandhoo added, is to "start building up the optical mesh network" within the next six months.
>
> In addition, Sandhoo said SDA is taking a "strategic pause" in Tranche 1 launch after discovering a "handful of things" that needed to be corrected in checkout of the 42 Transport Layer satellites already on orbit.
>
> The PWSA Tranche 1 includes 154 satellites total: 126 data relay satellites in the Transport Layer constellation, 28 missile warning/tracking birds in the Tracking Layer constellation, along with four missile defense fire control demonstration satellites. Tranche 1 is intended to provide service over the Indo-Pacific region.
>
> SDA in 2022 contracted with York Space Systems, Lockheed Martin and Northrop Grumman to each provide 42 Tranche 1 Transport Layer satellites. The agency last fall launched the first of those, 21 built by York and 21 built by Lockheed Martin, and had planned to begin launching the rest early this year.

55. In April 2026, the United States military Space Force released its Spring 2026 budget, revealing a restructuring of the SDA's Transport Layer program and an immediate halt to the third tranche of Transport Layer payments. The third tranche of the Transport Layer program payments, which had previously been expected to substantially benefit York, would instead be used to fund the newly unveiled Space Data Network.

56. On May 11, 2026, at approximately 10 AM EST, Wolfpack Research published a short report entitled "YSS: Lost In Space — The Pentagon Just Killed 96% of York's Revenue" (the "Report"). Citing multiple former software engineers who stated that York "***sent satellites into space without even knowing if the software was fit to accomplish its basic mission***," the Report suspected that the Pentagon's decision to eliminate the Tranche 3 funding was "rooted in severe disappointment in York." Specifically, the Report stated as follows, in relevant part:

> • We are short York Space Systems Inc. ("York") as 96% of 2025 revenue came from selling satellites to one customer: the Pentagon's Space Development Agency

(SDA), and that customer is being eliminated. York's IPO was predicated on the idea that they would continue to experience explosive growth as the "incumbent" provider for the SDA's Transport Layer program. In late April, the Pentagon announced it had wiped out future funding for the SDA's Tranche 3 Transport Layer and is dissolving the SDA itself for good measure, effectively gutting the program upon which York based its growth thesis in its January IPO. This is not a freeze, nor a hiccup. The program York relied on is being replaced by a program built around SpaceX as the sole-source provider.1 We spoke with multiple former employees who were highly critical of York and heard claims that York deceived the SDA with false advertising to win its contracts, cut corners, and delivered satellites whose mission-critical-software was not completed. Given this context, we believe the Pentagon's decision to eliminate Tranche 3 Transport Layer ("Tranche 3") was rooted in severe disappointment in York.

* * *

• Two former software engineers told us the company sent satellites into space without even knowing if the software was fit to accomplish its basic mission, so it did not fall behind on launch schedules. As a former employee told us, of York's satellites "They all have problems in flight." The problems with the software apparently became glaring post-launch and we were told that the SDA has been "pretty unhappy." ***These problems have since been confirmed, as it was reported in March that the satellites launched as part of Tranche 1 are "three months behind" and there has been a "strategic pause" on further launches until May/June 2026.***

* * *

**Former Employees Reveal York Did Not Complete Its Mission-Critical-Software Prior to Launch**

While we will reveal numerous claims made by former employees, the most devastating, in our view, is that York's satellites simply did not function as expected because the company did not finish developing the software for these satellites before launching them.

A former employee told us that all the satellites have had problems in flight due to incomplete software:

*No, I mean,* ***they all have problems in flight,*** *and a lot of it is relying on, especially software, software is never really fully developed before they're launched. And so there's a lot of debugging that happens while they're in orbit,* ***which means that the customer does not get the science that they asked for from the payload because [York is] still working through kinks.***

A former software engineer corroborated this; explaining that **York would wait to fully develop the spacecraft's software until orbit** because the company was so behind schedule.

*We were way behind schedule in terms of a lot of the mission functionality. So, then we planned over on-air updates while it was on orbit as we fleshed out, you know, some of those requirements and details of how the mission was really going to work.*

In our view, York's apparent strategy of delivering satellites that lack "mission functionality" just to ensure they don't miss their launch date isn't exactly a great strategy for repeat business.

One former employee we spoke to explained the risk of launching unprepared spacecraft with the SDA:

*I don't think it presents as big of a risk of, like, losing the spacecraft. It just presents a risk of, like, pissing off the customer. So, they're like, you've been up there for a long time. What are you doing?*

While the SDA and the Pentagon may not have been fully aware of York's deficiencies initially, we suspect they are certainly aware now that the T1 Transport satellites have been launched.

With only 1/3 of the Transport Layer satellites launched, the program is having to do a "strategic pause" while already 3 months behind schedule. We learned from one former employee that York had to update each program individually when it found bugs, instead of being able to update them all at once. This sheds additional light on the SDA's decision to delay T1 Transport so that fixes and patches can be made now, while they are on the ground, instead of in orbit post- launch.

Why are there so many problems? A former manufacturing employee told us that employees became more aggressive when building Tranche 1 as deadlines loomed, stating:

*If they could find the smallest level of test that would give them an indication it was okay, they would run with it…it's just cutting that little extra corner to save 20 or 30 minutes when it could result in another 2 hours of rework because they didn't fully test something*

**York Allegedly Won Its SDA Contract by Claiming to Have a Modular Design, But Former Employees Claim Satellites Were "Made to Order"**

York unequivocally states that its competitive edge is due to its modular design that supposedly enables them to make "high-performance" satellites faster and cheaper than the competition:

*At the heart of York's model is our modular satellite spacecraft architecture — engineered for scalability, rapid production, and mission flexibility across commercial, civil, and defense applications. By combining proprietary designs with a streamlined manufacturing process, York delivers high-performance satellites faster and more cost- effectively than traditional and emerging aerospace players.*

This pitch apparently won over the SDA, but was it true? Former employees revealed to us that the truth is that York's satellites were made to order. As one said:

*[York has] this sort of misnomer about having a stock of platforms available.* ***Everything is made to order,*** *even though they're kind of like this idea of, hey, you know, we have all these platforms, [and] all we need to do is get your payload, we'll integrate it, it'll be done, we're like 90% there.* ***There are no platforms that are just hanging out ready to go, and everything is frantic.***

This former employee later reiterated that York had deceived the SDA into believing York had an advanced modular platform when that wasn't the case; explaining the SDA had *"this understanding of a mature platform that just doesn't exist."*

Another former employee corroborated that the SDA satellites were built to order but said that since the SDA was purchasing many satellites, that once York built one, they could duplicate the process and bring down costs. In our view, this is economies of scale, not a modular design.

*I think they got an award for 42 contracts or 42 satellites. So, the model of the bus wasn't going to change much, right? But they would have to take that first payload in and do all the integration and planning of the payload. Once you have that and it's locked in and it works, then you can cookie cutter from there and spread that cost down. There were some problems. I mean, everybody was late to schedule, and there were definitely quality issues on the very first launch. And SDA was not particularly happy with that.*

This is not the same thing as having a mature streamlined modular platform, it's economies of scale. How is this an advantage over Lockheed Martin, Northrop Grumman, Rocket Lab, or SpaceX? One former employee did not mince words, calling it *"false advertising"* and opining that it would cost them contracts going forward.

*You know, this is a nightmare…And I don't think that they'll get the next tranche. I think the reason that they have gotten the tranches that they did is because of that false advertising about having a platform that's ready to go and like just needs to be pulled off the shelf."*

> While the Pentagon has not specified the reasons for their move to halt Tranche 3 funding and destroy the SDA, we suspect it may have been due to York's failure to live up to their own hype.

(Footnotes omitted.)

57. On this news, YSS stock price fell approximately $7 during intraday trading on May 11, 2026, on unusually heavy trading volume.

58. By the commencement of this action, the Company's stock was trading as low as $9.33 per share, an over 70% decline from the $34 per share IPO price.

## CLASS ACTION ALLEGATIONS

59. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired York: (a) common stock pursuant and/or traceable to the Company's false and/or misleading Registration Statement issued in connection with the Company's IPO; and/or (b) securities between January 29, 2026 and May 11, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

60. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. The Company sold 18.5 million shares of common stock in the IPO. Moreover, record owners and other members of the Class may be

identified from records maintained by York or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

63. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws was violated by Defendants' acts as alleged herein;

(b) whether the Registration Statement, statements made by Defendants to the investing public in connection with the Company's IPO, and statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of York; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

64. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

65. The market for York's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, York's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired York's securities relying upon the integrity of the market price of the Company's securities and market information relating to York, and have been damaged thereby.

66. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of York's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about York's business, operations, and prospects as alleged herein.

67. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about York's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities

to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

68. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

69. During the Class Period, Plaintiff and the Class purchased York's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

70. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding York, their control over, and/or receipt and/or modification of York's allegedly materially misleading misstatements and/or their

associations with the Company which made them privy to confidential proprietary information concerning York, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

**(FRAUD-ON-THE-MARKET DOCTRINE)**

71. The market for York's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, York's securities traded at artificially inflated prices during the Class Period. On April 22, 2026, the Company's share price closed at a Class Period high of $43.45 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of York's securities and market information relating to York, and have been damaged thereby.

72. During the Class Period, the artificial inflation of York's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about York's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of York and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

73. At all relevant times, the market for York's securities was an efficient market for the following reasons, among others:

74. (a) York shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, York filed periodic public reports with the SEC and/or the NYSE;

(c) York regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) York was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

75. As a result of the foregoing, the market for York's securities promptly digested current information regarding York from all publicly available sources and reflected such information in York's share price. Under these circumstances, all purchasers of York's securities during the Class Period suffered similar injury through their purchase of York's securities at artificially inflated prices and a presumption of reliance applies.

76. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements

and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

77. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of York who knew that the statement was false when made.

**FIRST CLAIM**

**Violation of Section 11 of the Securities Act**

**(Against All Defendants)**

78. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

79. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

80. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

81. York is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

82. As issuer of the shares, York is strictly liable to Plaintiff and the Class for the misstatements and omissions.

83. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement was true and without omissions of any material facts and were not misleading.

84. By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

85. Plaintiff acquired York shares pursuant and/or traceable to the Registration Statement for the IPO.

86. Plaintiff and the Class have sustained damages. The value of York Class A common stock has declined substantially subsequent to and due to the Defendants' violations.

**SECOND CLAIM**

**Violation of Section 15 of the Securities Act**

**(Against the Securities Act Individual Defendants)**

87. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

88. This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

89. The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of York within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause York to engage in the acts described herein.

90. The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

91. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**THIRD CLAIM**

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against York and the Individual Defendants**

92. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

93. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase York's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

94. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for York's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

95. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about York's financial well-being and prospects, as specified herein.

96. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of York's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to

make the statements made about York and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

97. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

98. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing York's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by

Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

99. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of York's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired York's securities during the Class Period at artificially high prices and were damaged thereby.

100. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that York was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their York securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

101. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**<u>FOURTH CLAIM</u>**

**Violation of Section 20(a) of The Exchange Act**

**<u>Against the Individual Defendants</u>**

103. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

104. Individual Defendants acted as controlling persons of York within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

105. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

106. As set forth above, York and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: August 31, 2026

**GLANCY PRONGAY WOLKE & ROTTER LLP**

By: *_/s/ Pavithra Rajesh_*
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
clinehan@glancylaw.com
prajesh@glancylaw.com

*Counsel for Plaintiff Matthew Ianelli*

**SWORN CERTIFICATION OF PLAINTIFF**
**YORK SPACE SYSTEMS INC. (YSS) SECURITIES LITIGATION**

I, Matthew Ianelli, certify that:

1. I have reviewed the Complaint, adopt its allegations, and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2. I did not purchase the York Space Systems Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in York Space Systems Inc. securities during the period set forth in the Complaint are as follows:

   (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class in any action under the federal securities laws (15 U.S. Code, Chapter 2B; and 15 U.S. Code, Chapter 2A, Subchapter I) during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

8/28/2026
Date

Matthew Ianelli

**Matthew Ianelli 's Transactions in York Space Systems Inc. (YSS)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 1/29/2026 | Bought | 148 | $35.0000 |
| 1/29/2026 | Bought | 737 | $38.0000 |
| 3/26/2026 | Bought | 43 | $22.0000 |
| 3/30/2026 | Bought | 46 | $21.5100 |
| 5/14/2026 | Bought | 35 | $26.7300 |
| 5/18/2026 | Bought | 1 | $25.2600 |
| 5/18/2026 | Bought | 70 | $26.0000 |
| 6/12/2026 | Sold | -1,080 | $33.5100 |
| 6/18/2026 | Bought | 714 | $28.0000 |
| 6/23/2026 | Sold | -714 | $28.0000 |
| 6/26/2026 | Bought | 770 | $25.9400 |
| 6/29/2026 | Sold | -770 | $25.3700 |